## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICHAEL B. WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07-3279 |
| | ) | |
| SELECT GROUP INSURANCE | ) | |
| TRUST, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Pending before the Court are Defendant Select Group Insurance Trust's Motion for Summary Judgment (d/e 24) and Plaintiff Michael B. Wallace's Motion for Summary Judgment (d/e 27).  Wallace's First Amended Complaint (d/e 10) seeks to recover disability benefits allegedly due under the terms of an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1971 (ERISA).  <u>See</u> 29 U.S.C. § 1132(a)(1)(B).  Both parties have moved for summary judgment.  For the reasons set forth below, Defendant's Motion for Summary Judgment is allowed, and Plaintiff's Motion for Summary Judgment is denied.

BACKGROUND

Wallace participated in an employee welfare benefit plan (the Plan) as an employee of Converter Concepts, Inc.  The Plan is administered by Unum Life Insurance Company of America (Unum).  Unum insures the Plan through Policy No. 292000 issued to the Maine National Bank, as Trustee of Defendant Select Group Insurance Trust.  The applicable Plan documents are included in the record.  See Defendant's Appendix to Motion for Summary Judgment (d/e 25) (Defendant's Appendix), UACL00634-763, Policy No. 292000; UACL00567-595, Summary of Benefits; & UACL00767-787, Certificate of Coverage.[1]

Beginning in late 2000 and early 2001, Wallace developed symptoms of persistent diarrhea and fatigue.  On April 21, 2001, Wallace was diagnosed with human immunodeficiency virus (HIV).  On June 25, 2001, Wallace submitted a long-term disability claim to Unum.  The claim included an Employee's Statement, completed by Wallace, an Employer's Statement, completed by human resource manager Ruth Allensworth, and

---

[1] Defendant's Appendix is voluminous and is, therefore, filed as numerous attachments.  Because Defendant's Appendix contains sequential internal bates stamp numbers, the Court will cite to it by those numbers, despite the fact that the numbers are arranged in descending, rather than ascending, order.

an Attending Physician's Statement, completed by Dr. Angela Clay. Defendant's Appendix, UACL00020-28. The Employer Statement indicated that Wallace had stopped working on March 22, 2001 due to illness. On the Employee Statement, Wallace indicated that he was unable to work because he was "weak." Id., UACL00021.

Dr. Clay's Statement indicated a diagnosis of Leukopenia, oral and esophageal candidiasis, thrombocytopenia, and high viral load for HIV. Defendant's Appendix, UACL00028. Dr. Clay noted Wallace's symptoms to be as follows: weakness, fatigue, nausea, vomiting, and diarrhea. Id. Dr. Clay stated the following restrictions for Wallace: caution with lifting and fatigue. Id., UACL00027. Dr. Clay also noted that Wallace might have difficulty with thought processing due to medication, which would resolve if at all present. Dr. Clay stated that Wallace was unable to do heavy lifting and that his limitations would vary day to day secondary to his reactions to medication. Id. With respect to a prognosis for recovery, Dr. Clay opined that improvement was "highly likely" once Wallace adjusted to the side effects of his medication and his white blood cells increased. Id. She indicated that Wallace had not achieved maximum medical improvement and that she expected to see fundamental changes in his condition in three

to six months.

Upon receipt of Wallace's claim, Unum requested his medical records from various providers. Unum received records from Blessing Hospital, indicating in relevant part that Wallace had been hospitalized on March 14-15, 2001, based on a three-day history of vomiting and diarrhea with sore throat and intermittent fevers since the beginning of 2001. Defendant's Appendix, UACL00105-142. Wallace reported that he did not have a primary care physician, and he was seen by Dr. Clay in the hospital. Wallace's initial white blood cell count was 3.7, and he had a white blood cell count of 3.3 on the morning of March 15.[2] Wallace was treated with antibiotics and released on March 15, 2001, after reporting that he was feeling very well. Dr. Clay scheduled a follow up appointment for March 23, 2001.

Unum received records from Dr. Clay's office, Quincy Family Practice, which revealed that Wallace was seen by Quincy Family Practice doctors on February 24, 1998, June 21, 2000, August 2, 2000, March 23, 2001, and

---

[2]Various points in the record indicate slightly different reference ranges for white blood cell count. Compare Defendant's Appendix, UACL00040 (4.0 to 10.5 k/cmm) with Defendant's Appendix, UACL00157 (3.1 to 11.0 k/cmm). The parties do not address this disparity.

March 27, 2001.  Defendant's Appendix, UACL00037-45. In relevant part, Wallace saw Dr. Clay on March 23, 2001, complaining of fatigue and fever up to 101 degrees following his hospital stay the previous week.  Dr. Clay noted "HIV was neg. at the hospital."  Id., UACL00044.  Dr. Clay ordered blood tests and scheduled a follow up visit for the following week.

During a March 27, 2001 visit, Dr. Clay noted that Wallace's white blood count was 2.3.  Defendant's Appendix, UACL00044.  Wallace continued to complain of fatigue and report fever up to 101 degrees.  Dr. Clay referred Wallace to an oncologist, noting a concern for leukemia. Wallace saw Dr. Woolridge, an oncologist, who ordered blood work and referred Wallace to the Infectious Diseases Clinic of the University of Missouri Hospitals and Clinics.

On April 20, 2001, Dr. George Koch and Dr. E. Dale Everett of the Infectious Diseases Clinic examined Wallace.  Defendant's Appendix, UACL00082-83.  They noted that two prior HIV tests had been negative; however, the doctors stated an impression of HIV seroconversion.[3]  The doctors prescribed antiviral medications, Combivir and efavirenz.  Wallace

---

[3]Seroconversion is defined as the production of antibodies in response to an antigen.  Merriam-Webster's Collegiate Dictionary 1069 (10th ed. 1993).

had a follow up appointment with Dr. Koch and a Dr. William Salzer on June 5, 2001.  The progress notes from the appointment describe Wallace as newly diagnosed with HIV infection.  Id., UACL00077.  Wallace reported that he had been doing well, but he continued to complain of fatigue, which he characterized as possibly slightly improved since his last visit.  The doctors directed follow-up in approximately three months.  Id., UACL00078.

Unum sent Wallace a letter, dated August 3, 2001, confirming its decision to pay monthly long-term disability benefits under a reservation of rights while it evaluated whether Wallace's condition fell under the Plan's exclusion for pre-existing medical conditions.  Defendant's Appendix, UACL00062-65.  Unum began paying benefits effective June 21, 2001.  In a letter, dated July 17, 2002, Unum informed Wallace that it had completed its review on the pre-existing condition issue and approved his claim for long-term disability benefits.  Id., UACL00213.  The letter also stated as follows: "You will receive monthly benefit payments as long as you continue to satisfy the definition of disability and all other policy provisions.  It may be necessary for you to also submit additional information from time to time as continued proof of disability.  Please refer to your policy under

Section VI titled 'GENERAL POLICY PROVISIONS'."  Id.

On May 8, 2002, while Unum's evaluation of the pre-existing condition issue was on-going, Unum sent Wallace a request for an updated certification of continued disability.  Defendant's Appendix, UACL00206. Unum enclosed a medical supplemental statement form to be completed by Wallace and his attending physician and a capacities' form for the doctor to complete.  Unum asked that the forms be returned within thirty days.

On July 19, 2002, a Unum representative attempted to telephone Wallace to inquire about the supplemental form that had not been returned. Defendant's Appendix, UACL00215.  The call notes indicate that the representative was told she had the wrong number.  When the representative called a secondary number in the file, it was disconnected. The representative attempted to telephone Wallace again on July 25, 2002, but there was no answer.  Id., UACL00216.  The call notes indicate that the representative planned to send Wallace a letter.

In a letter, dated August 6, 2002, Unum informed Wallace of its attempts to contact him regarding the medical supplemental statement form.  Defendant's Appendix, UACL00221-22.  The letter reminded Wallace that the Plan required proof of continued disability to be provided

within thirty days of a request for such.  The letter concluded as follows: "If you are interested in continued disability benefits please contact me immediately. If no contact has been made within 30 days from the date of this letter, it may be necessary to suspend any future benefit payments until we hear from you regarding your current medical treatment."  Id., UACL00221.

Wallace contacted Unum by telephone on August 9, 2002, and asked Unum to resend the forms to him because he was unable to locate them. Defendant's Appendix, UACL00223.  Unum resent the forms with a cover letter, dated August 12, 2002.  Id., UACL00224.  Unum asked that the forms be completed and returned by August 26, 2002.

The parties agree that Wallace provided Unum with a four-page supplemental statement on August 29, 2002.  See Defendant's Appendix, UACL00227-30.  Wallace's submission included a one-page Claimant's Statement and a one-page Attending Physician's Statement.  In the Claimant's Statement, Wallace indicated that he was not able to return to work yet.  Id., UACL00228.  Wallace indicated that his illness impeded his ability to work as follows: "several fatigue, diarrhea, small fevers about once a month."  Id.  Wallace described his current activities as "Rest & try to do

small walks daily." Id.  Wallace noted that his current condition prevented him from caring for himself, but he failed to indicate how, despite being asked to do so.  Wallace further indicated that no one provided him assistance.  Wallace noted that he was awaiting a decision on Social Security disability benefits.

The Attending Physician's Statement was completed by Dr. William Salzer.  Defendant's Appendix, UACL00227.  Dr. Salzer indicated that Wallace sees a doctor in Quincy, Illinois, and that Salzer had not seen him in the previous nine months.  Dr. Salzer noted that fatigue impaired Wallace's work capacity, but he did not complete the section relating to functional capacity.

In a letter, dated September 6, 2002, Unum informed Wallace that it was unable to continue benefits based on the limited information he provided regarding proof of on-going disability.  Defendant's Appendix, UACL00234-36.  Unum explained "The information you provided on August 29, 2002, from Dr. Salzer indicates that he has not seen you in nine months and that you are being treated by someone in Quincy, IL.  The name of this doctor is not provided.  In addition, no restrictions or limitations were provided." Id., UACL00235.  Unum informed Wallace of

his administrative appeal rights.

On September 20, 2002, Wallace, through Attorney Lucinda Awerkamp, submitted an appeal to Unum. Defendant's Appendix, UACL00253. Awerkamp submitted the following documents with the appeal: progress notes from Dr. Chaudhry, dated April 24, 2002; lab records from April 2002 and August 2002, and an Attending Physician's Statement completed by Dr. Chaudhry, dated September 17, 2002. Id., UACL00241-51. On the Attending Physician's Statement, Dr. Chaudhry noted a diagnosis of HIV, stated that Wallace had "limited physical endurance -- ability to work depends upon nature of job available," and characterized Wallace's condition as "chronic" and "permanent." Id., UACL00241.

On September 26, 2002, Awerkamp forwarded Unum an Attending Physician's Statement completed by Dr. Clay, dated September 24, 2002. Defendant's Appendix, UACL00237 & UACL00239. Dr. Clay noted a diagnosis of HIV, fatigue, and general weakness. She characterized Wallace's restrictions as "Chronic Fatigue, HIV status." Id., UACL00239. Dr. Clay marked "Yes", in response to the question "Has patient been released to work in his/her occupation?" Id. However, Dr. Clay marked "No," in response to the follow-up question "In any occupation?" Id. Dr.

Clay noted that Dr. Salzer did not release Wallace to work.

In October 2002, Glenda Lawson, R.N., reviewed the additional documentation that had been submitted in connection with Wallace's appeal.  Defendant's Appendix, UACL00254-55.  She noted that Wallace had a normal viral load and CD4 count in April and August 2002.  Lawson opined that the records submitted failed to identify specific restrictions and limitations.  She forwarded the records for physician review by Nancy Beecher, M.D.

On October 10, 2002, Dr. Nancy Beecher opined that Wallace's HIV was controlled.  Defendant's Appendix, UACL00256.  She noted Dr. Chaudhry's statement that Wallace had limited physical endurance and his ability to work depended on the type of job.  Dr. Beecher recommended that Unum forward a copy of Wallace's job description to Dr. Chaudhry to obtain his opinion of Wallace's restrictions and limitations relating to his former position.

On October 16, 2002, Awerkamp faxed Unum records relating to an August 28, 2002, examination of Wallace by Dr. Chaudhry.  Defendant's Appendix, UACL00258-66.  The records indicate that Wallace was feeling well and had no new symptoms.  Wallace reported that "[h]e still has good

days and bad days when he feels tired and fatigued, and cannot really do very much which involves physical endurance.  Also episodic diarrhea off and on, but this resolves on its own." Id., UACL00264.  Dr. Chaudhry noted that Wallace looked "his normal self."  Id., UACL00265.  Dr. Chaudhry further noted as follows:

> He brings disability forms for me to fill out.  These pertain to a time period when I was not his physician, and are from his former employer, Converter Concepts who are now out of business.  He was followed by Dr. Angela Clay at that time.  I have suggested that he get new forms and take them to Dr. Clay's office to see what she can do to help him.  I told him that it is not appropriate for me to fill out any kind of forms for him that pertain to a time period when I was not his physician.

Id., UACL00264.

On October 18, 2002, Unum sent Wallace a letter indicating that the supplemental information had been reviewed and that it was deemed insufficient to reverse the previous decision to discontinue benefits. Defendant's Appendix, UACL00268.  However, the letter informed Wallace that the claim file was being submitted for appellate review.

On October 22, 2002, Awerkamp faxed Unum updated records from Dr. Clay and asked that the records be forwarded to the appeals unit. Defendant's Appendix, UACL00271-73.  The records reveal that Wallace

saw a Dr. M. Hoffman on September 10, 2002, because Dr. Clay was out

of town.  Dr. Hoffman noted that Wallace complained of a sore throat and

fatigue and wanted disability forms filled out.  Dr. Hoffman noted that

Wallace had not seen Dr. Clay in over a year and that the office had no

recent records on him.  Dr. Hoffman did not feel comfortable filling out the

disability forms, given his limited knowledge of the patient.  Dr. Hoffman

prescribed Augmentin, an antibiotic, for Wallace's sore throat and directed

Wallace to follow up with Dr. Clay in two to three weeks.  The records

reveal that Wallace saw Dr. Clay on September 24, 2002.[4]  Dr. Clay noted

that Wallace's most recent viral load was still undetectable.  Wallace

complained of double vision when he was very tired.  Dr. Clay told Wallace

that he should see an ophthalmologist.  She also discussed the need for

Wallace to see an HIV specialist at least once a year.  Dr. Clay filled out

Wallace's long term disability form.

By fax dated November 1, 2002, Unum requested that Dr. Chaudhry

review Wallace's position description and comment on current restrictions

and limitations that would prevent Wallace from performing the duties of

---

[4]The Court notes that this is the same date that Dr. Clay completed the Attending
Physician's Statement, which was faxed to Unum on September 26, 2002

13

the position.   Defendant's Appendix, UACL00281-89.   Unum also

requested "copies of all office notes, test results and consultative reports that

support the information you have provided" and enclosed a release signed

by Wallace.  Id., UACL00281 & UACL00285.

Dr. Chaudhry responded by letter dated November 20, 2002.

Defendant's Appendix, UACL00290-91.  Dr. Chaudhry stated that, in

formulating his response, he reviewed the job description and met with

Wallace.  With respect to current restrictions and limitations that would

prevent Wallace from performing the duties of his position, Dr. Chaudhry

noted as follows:

> Mr. Wallace tells me that ever since his initial diagnosis he has
> been plagued by disabling fatigue, so much so that he cannot
> ambulate and move about normally.   This apparently is
> pervasive and remains with him most of the time.
> Superimposed upon this are episodes that he relates consisting
> of high fevers, sore throat, increased visual blurring and slowness
> of thought.  These episodes apparently can last for up to two
> weeks out of every month.  The patient says that even the
> slightest activity will often result in disabling fatigue and total
> inability to walk.  Even when feeling well he cannot walk more
> than 1 ½ blocks.  He also tells me that he cannot use his hands
> as described in your job analysis.

> Therefore, for all the disability that the patient describes as
> detailed above, he would probably be unable to make
> independent judgments, and employ written, verbal and
> reasoning skills on a consistent basis.  His vision is not likely to

remain good on a consistent basis.  He would probably be at risk of injuring himself and others based on his use of the tools as described.

In summary, given the patient's complaints as outlined above, I do not think it would be possible for him to discharge his duties in the appropriate manner.

Id., UACL00290-91.  Dr. Chaudhry enclosed copies of his clinical notes.

Dr. Chaudhry concluded his letter as follows:

Please note that I have seen Mr. Wallace in the capacity of an infectious disease consultant.  His primary physician is Doctor Angela Clay of the Southern Illinois University Family Practice Center.  I would be grateful if you would address any future inquiries to Doctor Clay directly.

Id., UACL00290.

In November 2002, Nurse Lawson reviewed Wallace's file.

Defendant's Appendix, UACL00292-93.  She concluded that the record did not clearly support the identified restrictions and limitations.  Lawson noted that the records revealed one episode of sore throat and no recorded elevated temperatures.  Lawson noted the lack of record evidence to support a finding of cognitive dysfunction.  Lawson also opined that Wallace's HIV was under good control, although she noted that the prognosis for HIV is only fair and that the median time of HIV progression to AIDS is ten to twelve years.  Lawson noted that it was unclear whether Wallace had

followed up with an ophthalmologist as recommended. Lawson again forwarded the file for physician review by Dr. Beecher.

Dr. Beecher completed her review of Wallace's file on November 27, 2002. Defendant's Appendix, UACL00295-99. According to Dr. Beecher, Wallace's medical records reveal "excellent results" from therapy and an undetectable viral load. Id., UACL00296. Dr. Beecher further noted that "[t]here is little in the records about any side effects from the medications." Id. According to Dr. Beecher, "[t]he records do not define any vision or hand problems." Id. Dr. Beecher opined that Wallace's identified restrictions and limitations were not supported for sedentary work once Wallace's HIV was controlled and his candidiasis resolved. Dr. Beecher recommended obtaining eye exam records and asking whether Wallace had seen a doctor for his hands or had any cognitive testing. With respect to prognosis, Dr. Beecher explained that Wallace's HIV was controlled with no mentioned side effects from medications and that his position was a sedentary one. She noted that a pending legal action and Wallace's belief that he would not be hired due to HIV status were likely affecting his decision about working and that Wallace had likely become deconditioned as well.

That same day, Unum contacted Wallace's attorney to inquire whether Wallace had received any treatment from specialists, specifically an ophthalmologist or neurologist.  Defendant's Appendix, UACL00301. Awerkamp informed Unum that Wallace had not seen any specialists and stated that Unum had everything.

In a letter, dated December 17, 2002, Unum informed Wallace, through his attorney, that it was upholding the decision to terminate benefits.  Defendant's Appendix, UACL00304-06.  However, on February 3, 2003, Awerkamp provided additional records, including a decision dated January 13, 2003, from the Social Security Administration (SSA) finding Wallace to be disabled as of February 1, 2001, and a letter from Dr. Clay dated January 27, 2003.  Id., UACL00318-35.  The SSA decision determined that Wallace was unable to perform his past relevant work because he could not respond appropriately to work pressures in a usual work setting.  The SSA further found that Wallace's marked limitation in his ability to respond appropriately to usual work situations prevented him from performing other unskilled work.  Awerkamp requested that Unum conduct a second administrative appeal, which it did.

Unum arranged for Missy Goodwin, R.N. to complete a clinical review

of the additional information submitted by Wallace.  Defendant's Appendix,

UACL00343-44.    Goodwin opined that the additional information

submitted revealed that Wallace's HIV remained stable and well controlled

and there was no indication that Wallace was experiencing side effects from

medication.  Goodwin noted that Wallace was experiencing no illnesses as

complications of his immune disease.  Goodwin also noted that medical

records offered little to no documentation to support Wallace's complaints

of extreme fatigue, chronic diarrhea, fever, blurred vision, sore throat and

mental slowing.  Goodwin could not, however, exclude that Wallace could

be experiencing the stated symptoms.  Goodwin forwarded Wallace's file to

Dr. Beecher for physician review.

On March 26, 2003, Dr. Beecher reviewed all medical records received

since her last review on November 27, 2002.    Defendant's Appendix,

UACL00346-47.  Dr. Beecher noted that both Dr. Chaudhry and Dr. Clay

passed on complaints that Wallace reported to them.  She opined that

Wallace probably experienced all of the stated symptoms when he was first

diagnosed with HIV and had a high viral load.  However, Dr. Beecher noted

that since Wallace's viral load became undetectable and his lab results

became within normal limits, there was no mention of the symptoms in the

records.  Dr. Beecher opined that, if Wallace "indeed had high fevers, visual problems and mental status changes, one would have expected him to seek medical help for these . . . ."  Id., UACL00346.  She characterized the reported symptoms and claimed impairment as "very puzzling," "self reported," and "out of proportion to the medical findings."  Id.  Dr. Beecher noted no documentation of fever since April 2002 when Wallace's HIV became controlled by medication.  She further noted that the complaints of on-going severe fatigue remained consistent despite the success of his HIV treatment.  Thus, Dr. Beecher opined that it is unlikely that the HIV was causing the fatigue and noted the possibility that the fatigue resulted from worsening depression.  Because the SSA's finding was based in part on dysthymia, a chronic depression, Dr. Beecher recommended inquiring into whether Wallace had any psychiatric evaluation or treatment and, if so, obtaining related records for review.

In a letter, dated April 7, 2003, Unum informed Wallace that it found no basis to alter its original decision to discontinue benefits.  Defendant's Appendix, UACL00355-57.  Unum noted no medical support for finding a loss of functionality due to HIV or HIV treatment.  Based on Dr. Beecher's recommendation, Unum gave Wallace forty-five days to supply records

relating to psychiatric treatment or evaluation.

On April 15, 2003, Wallace called Unum, left a message for his appeal's specialist Brooke Lewis, and eventually spoke with appeal consultant Doris Stout.  Defendant's Appendix, UACL00365-66.  Wallace told Stout that he would be hiring a new attorney and that he could not work because his body just would not do it.  Wallace stated he would have to contact the media, specifically 60 Minutes and Dateline.

Lewis returned Wallace's call later on April 15, 2003.  Defendant's Appendix, UACL00367-68.  Wallace informed Lewis that he would be hiring a new attorney and contacting his congressman and 60 Minutes. Lewis discussed with Wallace the invitation for him to submit additional psychiatric records.  Wallace stated that he had a psych test in connection with his Social Security evaluation.  Lewis asked Wallace to obtain those records and provide them to Unum.

On May 18, 2003, Wallace faxed Lewis two pages of a psychological report from Psychology Associates, dated October 3, 2002.  Defendant's Appendix, UACL00370-74.  Markings on the psychological report indicate that the entire report was eight pages, and Wallace does not contest that this was the case.  Defendant's Memorandum, p. 21, ¶ 62; Response to

Defendant's Motion for Summary Judgment (d/e 31) (Plaintiff's Response),
p. 4 (failing to contest Defendant's proffered material facts).[5]  Wallace's
cover sheet indicated that he wished to initiate a third appeal of Unum's
decision.  On May 20, 2003, Unum received a thirty-one page fax from the
Office of Congressman Lane Evans.  Id., UACL00382-413.   This fax
contained a letter from Congressman Evans and duplicate copies of
documents already contained in the administrative record.   Wallace
concedes that Evans' letter incorrectly stated that Wallace had AIDS, given
the fact that Wallace's CD4 blood count was normal at 945 on November
26, 2002.  Defendant's Memorandum, p. 21, ¶ 63; Plaintiff's Response, p.
4 (failing to contest Defendant's proffered material facts). Wallace further
concedes that diagnostic criteria for AIDS requires a CD4 count below 200.
Defendant's Memorandum, p. 21, ¶ 63; Plaintiff's Response, p. 4 (failing to
contest Defendant's proffered material facts).

Wallace's new attorney, Anthony Cameron, contacted Unum by letter,
dated June 18, 2003, and requested an additional thirty days to supplement

---

[5]Wallace responded to Defendant's proffered undisputed material facts as follows:
"Plaintiff does not dispute any of Defendant's representations that the record contains
all of the 89 entries and that they are material to the consideration of this matter."
Plaintiff's Response, p. 3-4.  Wallace did not identify any of Defendant's proffered facts
as either disputed or immaterial.  Id., p. 4.

Wallace's appeal.  Defendant's Appendix, UACL00435-36.  Cameron noted that Unum had already been provided with "reports from the esteemed diagnostician, Dr. Frank Froman," although Wallace concedes that the only information submitted relating to Dr. Froman was the two pages of the eight-page psychological report from Psychology Associates.  Id., UACL00436; see also Defendant's Memorandum, p. 21, ¶ 64; Plaintiff's Response, p. 4 (failing to contest Defendant's proffered material facts).

On August 8, 2003, Cameron faxed Unum an Attending Physician's Statement, dated July 29, 2003, that had been completed by Dr. Raghvendra Adiga.  Defendant's Appendix, UACL00444-46.  Dr. Adiga noted that Wallace continued to have chronic fatigue and intermittent diarrhea.  Dr. Adiga reported that Wallace had not been released to work in his own or any other occupation.  When asked to fully describe Wallace's restrictions, Dr. Adiga stated that Wallace should not "work in dangerous environments with machinery."  Id., UACL00444.  When asked to fully describe Wallace's limitations, Dr. Adiga stated that Wallace could not lift weight greater than twenty pounds or work more than two hours at a time. Id.

By letter, dated August 20, 2003, Cameron forwarded Unum an

acknowledgment of representation.  The letter noted that Cameron recently sent Unum an additional copy of Dr. Froman's report and an initial report from Dr. Adiga.  Defendant's Appendix, UACL00448-51.  In a letter, dated September 30, 2003, Unum acknowledged the receipt of Dr. Adiga's Attending Physician's Statement and the letter of representation.  Unum requested clinical documentation to support Dr. Adiga's opinions and medical records for the year 2003.  Id., UACL00452-53.  Unum also enclosed two forms, an Estimated Functional Abilities Form and a Physician/Medication List, to be filled out either by Wallace or by his physicians.  Unum stated that, once these records were received, a final appellate review would commence.  Unum requested that the documentation be provided within forty-five days and noted that all medical data received on or before November 14, 2003, would be considered in the final appellate review.  Wallace concedes that Cameron did not provide Unum's forms and the request for medical records to Dr. Adiga until January 7, 2004.  Defendant's Memorandum, p. 22, ¶ 67; Plaintiff's Response, p. 4 (failing to contest Defendant's proffered material facts).  Cameron carbon copied Unum on the January 7, 2004, letter to Dr. Adiga.  Defendant's Appendix, UACL00454.  Cameron also sent a separate letter

to Unum on January 7, 2004, noting that Unum had never addressed Dr. Froman's analysis.  Id., UACL00454-57.

On February 17, 2004, Dr. Beecher conducted a medical review of all medical records and appeal mail received since her last medical review on March 26, 2003.  Defendant's Appendix, UACL00462.  Dr. Beecher again noted Wallace's excellent response to HIV treatment.  She acknowledged Wallace's reports that he slept twelve hours a day and was just too tired to work.  She concluded that Wallace's HIV infection appeared to be controlled with medication and that side effects of the medications "appear to be minimal and manageable."  Id.  She noted that Wallace appeared to have significant depression that was untreated.  She noted that Unum had only received a part of the SSA psychological evaluation and recommended that Unum request the Minnesota Multiphasic Personality Inventory (MMPI) results from the evaluation.  According to Dr. Beecher, Wallace should not be impaired for full-time sedentary work from a physical standpoint.  She opined that "if the depression is causing impairment this should be treatable with meds and therapy."  Id.

Unum sent two letters to Cameron, on March 12, 2004, and April 23,

2004, requesting Wallace's MMPI results.[6]  By letter, dated April 21, 2004, Cameron forwarded Unum the complete report of clinical psychologist Frank Froman, Ed.D., and a copy of the Social Security award.  <u>Defendant's Appendix</u>, UACL00471-85. Wallace concedes that this is the first time Dr. Froman's complete report was submitted to Unum.   <u>Defendant's Memorandum</u>, p. 23, ¶ 71; <u>Plaintiff's Response</u>, p. 4 (failing to contest Defendant's proffered material facts).

According to Dr. Froman's report, Wallace arrived early for the session and was fully cooperative.  Dr. Froman noted that Wallace appeared to be lethargic, laid back, and tired and that Wallace's "sense of fatigue never left him throughout the interview."   <u>Defendant's Appendix</u>, UACL00478. According to Dr. Froman, Wallace presented as a "very tired individual whose ability to relate was nevertheless fairly good." <u>Id</u>., UACL00477.  Dr. Froman noted "a rather clear and present dysthymia present in terms of a slowing of pace, withdrawal, and a sense of ever presence of despair that he is attempting to deal with essentially on his own." <u>Id</u>.  After administering the MMPI, Dr. Froman assessed Wallace's profile to include the following:

---

[6]Wallace concedes that the March 12, 2004, letter was erroneously dated March 12, 2003.  <u>Defendant's Memorandum</u>, p. 23, ¶ 70; <u>Plaintiff's Response</u>, p. 4 (failing to contest Defendant's proffered material facts).

"he tended to under report his psychopathology;" "[h]is judgment is not now as good as it was in the past;" "[h]e worries a great deal about his physical health;" "[h]e tires quickly and feels tired a good deal of the time;" and "[h]e reports hypersomnia." Id., UACL00476.

Dr. Froman further noted as follows:

The gentleman is self-centered, focusing exclusively on how he feels. He is dissatisfied, and tends to feel somewhat negative and pessimistic. He is quite dissatisfied with his current life situation and with himself.

He is a gentleman who currently craves emotional attention and support, and may tend to use indirect or manipulative means to gain that attention. He is resistant to psychological interpretations and treatment, and any form of psychological intervention will be difficult with him. He tends to look for simplistic, concrete answers to his problems that do not require self-examination.

Defendant's Appendix, UACL00476. Dr. Froman assigned Wallace a GAF score of 60.[7] He diagnosed Wallace as suffering from mild dysthymia, secondary to physical problems. Dr. Froman opined as follows:

Based only on psychological factors, Michael has the capacity to perform simple one and two step assemblies at or at least near

---

[7]GAF is an assessment of an individual's overall level of psychological, social and occupational functioning which is used to make treatment decisions. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32 (4th ed. 2000). Scores range from 0 to 100, with lower numbers indicating more severe mental limitations. Id. at 34.

a competitive rate.  He is able to relate sluggishly to coworkers and supervisors, can understand simple oral and written instructions, and can easily manage cash benefits.  Were it not for his obvious fatigue, from a psychological view point, he would be able to withstand the stress associated with customary activities.

Id.

Dr. Froman completed an SSA form relating to Wallace's mental ability to do work-related activities.  Defendant's Appendix, UACL00472-73.  Dr. Froman indicated that Wallace had no or minimal limitations on his ability to understand, remember, and carry out short, simple instructions.  Dr. Froman indicated that Wallace had some mild limitations in his ability to understand, remember, and carry out detailed instructions and to make judgements on simple work-related decisions, but could generally function well in these areas.  Dr. Froman noted that Wallace's ability to respond appropriately to supervision, coworkers, and pressures in a work setting was not affected by his impairment.  However, Dr. Froman indicated that Wallace's ability to respond appropriately to work pressures in a usual work setting was severely limited, although not precluded.  Dr. Froman also noted moderate limitation in Wallace's ability to respond appropriately to changes in a routine work setting and some mild limitations

in Wallace's ability to interact appropriately with the public, coworkers, and supervisors.

In a letter, dated April 29, 2004, Unum informed Cameron that it found no basis to alter its prior decision that Wallace was not disabled as defined in the Plan, due to HIV. Defendant's Appendix, UACL00501-03. However, Unum stated that it would evaluate Wallace's claim from a behavioral health perspective, based on the information contained in Dr. Froman's report. The letter noted that the Plan limited benefits for disability due to mental illness to a maximum period of twenty-four months. Unum invited Wallace to submit supplemental information within thirty days. Neither Wallace nor Cameron responded to the request.

Unum consulted with clinical psychologist David Goldsmith, Ph.D., to review the entire administrative record. Dr. Goldsmith issued a report, dated August 13, 2004. Defendant's Appendix, UACL00504-06.[8] Dr. Goldsmith noted "a paucity of clinical information in support of a work-precluding psychiatric disorder." Id., UACL00504. Dr. Goldsmith specifically noted that records from four treating physicians, spanning

_____

[8] The Court notes that the pages of Dr. Goldsmith's report are Bates stamped out of order, but are all present in the record.

several years, were devoid of any suggestion that Wallace displayed an

impairing psychiatric condition; consistent with Wallace's medical records,

the MMPI revealed no substantial psychiatric disorder; and Dr. Froman, Dr.

Adiga, and Dr. Chaudhry all opined that Wallace could perform some jobs

without difficulty.  Dr. Goldsmith further noted that the estimated GAF of

60 fell at the cusp of mild to moderate symptoms and/or functional

difficulties, while a GAF of 61 would indicate that an individual is generally

functioning pretty well.  Dr. Goldsmith concluded as follows:

> Within a reasonable degree of professional certainty, it is
> evident that Mr. Wallace may convey mild dysthymia and a
> tendency to minimize the appearance of psychological
> difficulties; however, the available information does not support
> the assertion that psychiatric illness has caused or substantially
> contributed to an enduring loss of functional capacity, or
> imposed work-precluding restrictions and/or limitations for any
> span since 3/23/01 – and particularly beyond 8/20/02.

Id., UACL00505.

In a letter, dated August 17, 2004, Unum informed Wallace that it

would not alter its initial decision to discontinue benefits.  Defendant's

Appendix, UACL00507-09.  Wallace then filed the instant lawsuit.

## STANDARD OF REVIEW

While the parties agree that the instant matter should be decided on

the administrative record, they dispute the appropriate standard of review.

In <u>Firestone Tire & Rubber Company v. Bruch</u>, the Supreme Court held

that Courts should apply a de novo standard of review in actions challenging

the denial of benefits under an ERISA plan, "unless the benefit plan gives

the administrator or fiduciary discretionary authority to determine eligibility

for benefits or to construe the terms of the plan." <u>Firestone</u>, 489 U.S. 101,

105 (1989).  However, if a plan confers discretionary authority to determine

eligibility and benefits to the administrator, judicial review is deferential and

the plan's decision must be sustained unless it is arbitrary and capricious.

<u>Love v. National City Corp. Welfare Benefits Plan</u>, 574 F.3d 392, 396 (7th

Cir. 2009).

In a Text Order, dated September 24, 2008, Magistrate Judge Byron

Cudmore granted Wallace until November 14, 2008 to file a status report,

informing the Court if he disputed that the relevant standard of review was

the arbitrary and capricious standard.  Wallace did not do so.  Nevertheless,

Wallace urges the Court to apply a de novo review in the instant case.

According to Wallace, subsequent to November 2008, the Seventh Circuit

altered its definition of de novo review in the ERISA context.  <u>See</u> <u>Krolnik</u>

<u>v. Prudential Insurance Co. of America</u>, 570 F.3d 841 (7th Cir. 2009).

Wallace fails to note that <u>Krolnik</u> did not alter the standard of review for cases in which the plan administrator has discretionary authority.  The <u>Krolnik</u> Court reaffirmed the <u>Firestone</u> standard, specifically noting that "[u]nless a welfare-benefit plan confers interpretive or operational discretion on its administrator or insurer, the judiciary makes an independent decision about benefits." <u>Krolnik</u>, 570 F.3d at 842.  In <u>Krolnik</u>, the parties agreed that the applicable plan was subject to de novo review, and the Court declined to look beyond that agreement, noting that regardless of "what the Plan's language may be, people are free to accept the <u>Firestone</u> standard, which is ERISA's norm." <u>Id</u>.

In the instant case, Wallace does not dispute the fact that the Plan gives discretionary authority to Unum, and the record supports a finding that this type of discretionary authority exists.  The Certificate of Coverage in the instant case provides as follows:

**Discretionary Authority**

In making any benefits determination under the summary of benefits, we shall have the discretionary authority both to determine your eligibility for benefits and to construe the terms of the summary of benefits.

<u>Defendant's Appendix</u>, UACL00781.  Thus, the appropriate analysis is

whether the Plan's decision to discontinue Wallace's benefits was arbitrary and capricious.

The Seventh Circuit instructs that this standard of review is highly deferential.  It is the role of the Court to ensure that the Plan's decision "has rational support in the record."  <u>Jenkins v. Price Waterhouse Long Term Disability Plan</u>, 564 F.3d 856, 861 (7th Cir. 2009) (internal quotations and citation omitted).  This is not "a rubber stamp," but it does mean that the Court must not reverse unless a decision is "downright unreasonable."  <u>Id</u>. (internal quotations and citation omitted).  In conducting its review, the Court must remain "cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due," but recognize that, in such cases, "the standard of review remains the same, but the conflict of interest is weighed as a factor in determining whether there is an abuse of discretion."  <u>Id</u>. (internal quotations and citation omitted).  The Seventh Circuit instructs that any distinction between the arbitrary and capricious standard of review and testing for an abuse of discretion is one without a difference, as the terms are merely "different ways of saying the same thing."  <u>Id</u>. at 861 n.8 (internal quotations and citation omitted).

## ANALYSIS

The parties have filed cross motions for summary judgment.  Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  In the instant case, applying the applicable standard of review, the uncontested facts show that the Plan's decision to discontinue Wallace's benefits has rational support in the record and summary judgment in favor of Defendant is, therefore, appropriate.

The Plan employs a two-tiered definition of "disability" and "disabled" as follows:

>  . . . because of injury or sickness:
>
> 1.    you cannot perform each of the material duties of your regular occupation; and
>
> 2.    after benefits have been paid for 24 months, you cannot perform each of the material duties of any gainful occupation for which you are reasonably fitted by training, education or experience.

Defendant's Appendix, UACL00777.  Under the Plan, "[p]roof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof."  Id., UACL00644.

With this framework in mind, the Court addresses the various decisions at issue here.

A.  Initial Decision to Terminate Wallace's Benefits

On September 6, 2002, Unum informed Wallace that it was discontinuing his benefits based on his failure to provide proof of continued disability. This decision is supported by the record evidence. Unum had requested an updated certification of continued disability on May 8, 2002. It is undisputed that, under the terms of the Plan, Wallace had the burden of providing proof of continued disability within 30 days. Defendant's Appendix, UACL00644. When Wallace failed to make a timely response to the request for proof, Unum made several attempts to contact Wallace. Eventually, on August 6, 2002, Unum sent Wallace a letter extending the response time for an additional thirty days.

Wallace responded and eventually provided Unum with a statement that he completed as well as one from Dr. Salzer. Wallace's statement indicated that his ability to work was impacted by severe fatigue, diarrhea, and small fevers about once a month. Although Wallace noted that his condition prevented him from caring for himself, he failed to describe in what ways, and Wallace indicated that no one provided him with assistance.

Dr. Salzer's statement was brief and lacking in detail.   <u>Defendant's</u> <u>Appendix</u>, UACL00227.  Dr. Salzer indicated that he had not seen Wallace in nine months.  Although Dr. Salzer noted that Wallace's ability to work was impeded by fatigue, he did not explain to what degree.  Dr. Salzer did not complete the portion of the form dealing with Wallace's functional capacity.  Thus, Dr. Salzer offered no opinion on Wallace's ability to work and failed to identify any restrictions or limitations. Therefore, as of September 6, 2002, nothing in the record indicated that Wallace remained unable to perform each of the material duties of his regular occupation. Unum's decision to terminate Wallace's benefits was not arbitrary and capricious.

B.   <u>Determination that Wallace is Not Entitled to Benefits</u>

Because Unum determined that Wallace was not entitled to benefits before benefits had been paid for twenty-four months, the relevant inquiry is whether injury or sickness prevents Wallace from performing the material duties of his regular occupation.  According to Wallace, his work as a product technician "involved being regularly at a workstation, using a torque screwdriver and examining very small parts with the need for great visual acuity," as well as "lifting and bending."  <u>Plaintiff's Motion for Summary</u>

Judgment, p. 9.   The administrative record contains a position description/job analysis for the product technician position that was completed by supervisor Cindy Gerdes.   Defendant's Appendix, UACL00282-83.  The position description defines frequent as 34% to 66% of the time and continual as 67% to 100% of the time.  Gerdes indicated that the position requires the employee to relate to others, engage in written and verbal communication, and make independent judgments frequently. According to Gerdes, the position requires continual reasoning, math, and language.  Gerdes further indicated that the position requires frequent walking and continual sitting, as well as frequent lifting of power supplies weighing five to ten pounds.  Gerdes noted that, depending on the part of the job, it could be performed by alternating sitting and standing.  She characterized good vision as very important to the position, noting that a product technician "needs to be able to read very small parts to identify them."  Id., UACL00282.  Finally, Gerdes indicated that a product technician needs to use both hands in order to assemble and test products.

Unum determined that Wallace could perform his own occupation. At the conclusion of the first administrative appeal, on December 17, 2002, Unum informed Wallace that, after comparing the restrictions and

limitations on his functional capacity to the occupational requirements of his position, it was determined that he was not entitled to benefits under the Plan.    Defendant's Appendix, UACL00304-06.    In making this determination, Unum relied on Dr. Beecher's November 27, 2002, medical review of Wallace's file.  Dr. Beecher noted that Wallace had responded well to therapy, resulting in a CD4 count in the 700s and an undetectable viral load in contrast to a CD4 count of 400 and viral load of 395,000 at the time he was diagnosed with HIV.  Id., UACL00296.  With respect to fatigue, Dr. Beecher noted that Wallace's job was a sedentary one with no significant lifting.  Dr. Beecher noted that Wallace reported having three to four bowel movements each morning.  This is not inconsistent with Dr. Chaudhry's examination notes from an August 28, 2002, which report that Wallace suffered from episodic diarrhea off and on that resolves on its own. Defendant's Appendix, UACL00264.  Dr. Chaudhry's November 20, 2002, analysis of Wallace's functional capacity does not mention diarrhea or any restrictions or limitations associated with it.  Id., UACL00290-91.

Dr. Beecher also correctly noted that Wallace's medical records did not define any vision or hand problems.  According to Dr. Clay's notes from September 24, 2002, Wallace reported double vision when he was very

tired.  There is nothing in the record to indicate that Dr. Clay did anything to follow-up on this claim herself, but she did recommend that Wallace see an ophthalmologist, which he did not do.  The Attending Physician's Statement completed by Dr. Clay on September 24, 2002, characterized Wallace's restrictions only as "Chronic Fatigue, HIV status."  Defendant's Appendix, UACL00239.  Dr. Chaudhry's November 20, 2002, analysis of Wallace's functional capacity likewise failed to define any vision or hand problems.  Id., UACL00290-91.  With respect to vision, Dr. Chaudhry only noted that Wallace reported increased visual blurring and opines that Wallace's "vision is not likely to remain good on a consistent basis."[9]  Id., UACL00290.  With respect to hand problems, Dr. Chaudhry noted that Wallace "tells me that he cannot use his hands as described in your job analysis."  Id., UACL00291.

Certainly, Dr. Beecher's conclusion that Wallace could perform his own occupation conflicts with Dr. Chaudhry's November 20, 2002, opinion that given Wallace's complaints it would not be possible for Wallace to discharge the duties of his position.  However, "reaching a decision amid

---

[9]Notes from an August 28, 2002, examination by Dr. Chaudhry characterize Wallace's visual fields as "grossly normal."  Defendant's Appendix, UACL00265.

such conflicting medical evidence is a question of judgment that should be left to [the Plan] under the arbitrary-and-capricious standard." Davis v. Unum Life Ins. Co. of America, 444 F.3d 569, 578 (7th Cir. 2006).  The job of this Court is not to determine whether Unum's decision was correct, but merely to ensure that it was reasonable.  Id.  Additionally, the Supreme Court has expressly rejected the argument that the opinions of treating physicians deserve special weight in benefits determinations.  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  Thus, Unum's December 17, 2002, decision has reasonable support in the record.

At the conclusion of the second administrative appeal, on April 7, 2003, Unum informed Wallace that it determined that he was not entitled to benefits because "[t]here was no medical support found, which would likely cause a loss of functionality due to HIV or treatment." Defendant's Appendix, UACL00356.  At this point, Wallace had received a favorable SSA ruling for a parallel period.  However, the Social Security determination is not dispositive under these circumstances, but rather one more factor for consideration in the benefits determination.  Black v. Long Term Disability Ins., 582 F.3d 738, 748 (7th Cir. 2009).  In making its determination, Unum relied on Dr. Beecher's March 26, 2003, medical review of Wallace's

file. Dr. Beecher opined that it was unlikely that HIV was causing Wallace's fatigue, based on the fact that the complaints of fatigue remained constant despite the success of Wallace's HIV treatment. Again, Unum's decision has reasonable support in the record.

Unum issued its decision on Wallace's third administrative appeal in two parts. In a letter, dated April 29, 2004, Unum stated that it found no basis to alter its prior decision that Wallace was not disabled as defined in the Plan, due to HIV. Defendant's Appendix, UACL00501-03. This decision was supported by Dr. Beecher's February 17, 2004, medical review, which again noted that Wallace was doing well on his medical regimen and experiencing minimal side effects. Unum, however, gave Wallace the opportunity to supplement the record with information relating to psychiatric treatment or evaluations.

In a letter, dated August 17, 2004, Unum informed Wallace that it found no basis to alter its benefit determination based on a behavioral health review. Defendant's Appendix, UACL00507-09. In making this determination, Unum relied on Dr. Goldsmith's review of Wallace's file. Dr. Goldsmith expressly opined that the record evidence did not support a finding that psychiatric illness has caused or substantially contributed to a

loss of functional capacity for any period since March 23, 2001.  Id.,
UACL00505.  This provides adequate reasonable support for Unum's
decision.  While Dr. Froman provided opinions to the contrary, it is not the
role of this Court to weigh conflicting medical evidence under the arbitrary
and capricious standard.  Davis, 444 F.3d at 578.

Wallace raises several general arguments relating to the reasonableness
of Unum's overall decision that he was not entitled to benefits.  However,
as set forth below, these arguments are unpersuasive.  First, Wallace argues
that the decision that he was not entitled to benefits was arbitrary because
Unum had previously determined that he qualified for benefits and nothing,
other than his blood numbers, had changed in the interim.  The fact that
Unum at one point determined that Wallace was entitled to benefits does
not automatically render a subsequent decision to the contrary arbitrary.
See, e.g., Jenkins, 564 F.3d at 862; Leger v. Tribune Co. Long Term
Disability Ben. Plan, 557 F.3d 823, 832 (7th Cir. 2009).  The record clearly
reveals that, by August 2002, by all accounts Wallace's HIV was controlled.
The record was devoid of any evidence of continuing negative side effects
from treatment medication.   Both Dr. Clay and Dr. Chaudhry noted
improvement in Wallace's physical condition.  While the parties agree that

there is no cure for HIV, as the Seventh Circuit has recently recognized, the prognosis for individuals with HIV has improved since HIV was first reported in the United States in the early 1980s.  "[N]ew medicines . . . have slashed the death rate and raised the life expectancy of a diagnosed individual dramatically.  A patient diagnosed at 20 today can expect to live to nearly 70, research shows.  At 35 . . ., life expectancy is over 72."  Jenkins, 564 F.3d at 857 (internal quotations and citation omitted).

Wallace further argues that Unum erroneously failed to credit his self-reports of fatigue.  In doing so, Wallace relies on the Seventh Circuit opinion in Hawkins v. First Union Corporation Long-Term Disability Plan, for the proposition that subjective symptoms cannot be dismissed out of hand simply because they are subjective.  Hawkins, 326 F.3d 914, 919 (7th Cir. 2003).  The Seventh Circuit recently elaborated on Hawkins in Leger.  Leger, 557 F.3d 823, 834-35.  Leger prohibits a plan or the plan's consultant from merely dismissing subjective complaints out of hand. Instead, under Leger, the plan must explain why it deemed the subjective complaints unreliable.  Id. at 835.  In the instant case, Unum determined that the loss of functionality due to fatigue as reported by Wallace lacked support in the medical evidence.  The Seventh Circuit has recognized that a distinction

42

exists between the amount of fatigue an individual experiences, which is entirely subjective, and how much an individual's degree of fatigue limits his functional capabilities, which can be objectively measured. <u>Williams v. Aetna Life Ins. Co.</u>, 509 F.3d 317, (7th Cir. 2007). The record in the instant case is devoid of clinical evidence regarding the nature and extent of any physical limitations that resulted from Wallace's fatigue. Moreover, Dr. Beecher did not dismiss Wallace's complaints of fatigue out of hand, rather she rejected the notion that Wallace suffered fatigue to the degree reported as a result of HIV or HIV treatment because it was out of proportion to the medical findings. Therefore, Unum's treatment of Wallace's subjective complaints of fatigue were not arbitrary and capricious.

Thus, as outlined above, Unum's determination that Wallace was not entitled to benefits under the Plan has reasonable support in the record. Given the record, it is not "downright unreasonable" to find that Wallace is not prevented by injury or sickness from performing the material duties of his regular occupation as a product technician. Unum's denial of disability benefits must be upheld.

CONCLUSION

THEREFORE, Defendant Select Group Insurance Trust's Motion for

Summary Judgment (d/e 24) is ALLOWED, and Plaintiff Michael B. Wallace's Motion for Summary Judgment (d/e 27) is DENIED.  Judgment is entered in favor of Defendant Select Group Insurance Trust and against Plaintiff Wallace on all claims.  All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   December 16, 2009

      FOR THE COURT:

                s/  Jeanne E. Scott
                JEANNE E. SCOTT
           UNITED STATES DISTRICT JUDGE